UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL EUGENE ADDSON,<br><br>Petitioner,<br><br>v.<br><br>JENNIFER BENAVIDEZ,[1]<br><br>Respondent. | No. 2:19-cv-0847 KJM CKD P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner, a state prisoner proceeding pro se, has filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On September 15, 2015, petitioner pled no contest in the Superior Court of Sacramento County to four counts of possession of a firearm by a convicted felon. On September 18, 2015, also in the Superior Court of Sacramento County, petitioner was found guilty by a jury of first-degree murder, attempted second degree robbery, and five counts of second-degree robbery. Petitioner was sentenced for all convictions, but at this point, the operative sentence is a sentence of life imprisonment without the possibility of parole which was imposed on petitioner's conviction for first degree murder.

Petitioner presents three claims in his amended petition. For reasons which follow, the court will recommend that the amended petition for writ of habeas corpus be denied.

---

[1] Ms. Benavidez, the current warden at petitioner's place of confinement, is substituted as the respondent in this action pursuant to Rule 2 of the Rules Governing § 2255 Cases.

1

I. Background

On direct appeal, the California Court of Appeal summarized the facts presented at trial as follows:

> Over several months, two Auto Zone stores and two O'Reilly Auto Parts stores were robbed. After witnesses identified defendant, he was arrested and charged with felony murder, attempted second degree robbery, possession of a firearm by a felon, and armed second degree robbery. Defendant entered a plea of no contest to counts three, five, eight, and eleven. A jury trial followed on the remaining counts. The following evidence was introduced at trial.
>
> **July 11, 2013, Auto Zone Armed Robbery**
>
> On July 11, 2103, Duane Uhl was working as a parts manager at Auto Zone on Watt Avenue. That morning an African-American male, later identified as defendant, entered the store. Uhl approached defendant and offered to help him find air filters on the computer. Defendant followed Uhl behind the counter, pulled out a gun, and told Uhl he was being robbed.
>
> Defendant then led Uhl to the back office, pointed the gun at the safe, and told Uhl to open it. Uhl opened the safe with his key, took out money, and handed it to defendant. Defendant told Uhl to open the second safe compartment, which contained cash drops. Uhl did not have the key to the second compartment, which defendant disputed. Defendant told Uhl to open the cash registers, but Uhl was too nervous to type in his password. Angrily, defendant told Uhl to hurry up, but Uhl was unable to open the registers.
>
> Before he left, defendant told Uhl to take the handle off the phone and give it to him. Defendant put the money in a bag and told Uhl to get in a closet. Uhl begged defendant not to shoot him. Defendant told him he was not going to shoot him and closed him in the closet.
>
> After defendant left the store, Uhl called 911 and told the operator the suspect was armed with a silver Colt Combat Commander .45 handgun. Uhl had been in the military and thought he recognized the gun. He described the suspect as around 25 years old, six feet tall, thin, and wearing black. Approximately $1,300 was taken from the store. Cell phone records revealed a phone connected to defendant sent signals to cell towers in the Auto Zone neighborhood at the time of the robbery.
>
> **September 21, 2013, Auto Zone Armed Robbery**
>
> On September 21, 2013, Nicholas White, David Ponce, Alfred Montez, and Josh Kalista were working at the Auto Zone on Fair Oaks Boulevard. That afternoon Kalista walked into the back office with a man, later identified as defendant. Kalista told them they were being robbed. [Footnote omitted.] White, believing it was a joke, began to laugh. Defendant took out a gun and said he wasn't playing and this was real.

2

Defendant pointed the gun at White and Montez and told White to open the safe. He told the others to stand in the corner where he could watch them. Defendant also pointed the gun at Ponce and said, "Go ahead and take a good look" at his face.

Defendant told White to open the safe, take out the money, and put it in a bag. White did so. Defendant wanted both sections of the safe opened, but White could only open one compartment, because the second was on a timer. Defendant pointed the gun at White and told him to hurry up or he would shoot him.

Subsequently, defendant directed the employees to empty the store cash registers. Defendant pointed the gun at them as they opened the registers. He told them to hurry up, "I'm not playing." When Montez dropped a $20 bill on the floor, defendant put the gun in his face and giggled. The gun touched Montez's cheek. Defendant left with the money.

A frightened White called 911 and described the suspect as a black male, mid-twenties to early thirties, six feet tall, and 130 pounds. The man carried a semiautomatic pistol. He fled on foot carrying a Bank of America cash bag containing $1,196.04. After officers arrived at the scene, White said he would be able to identify the suspect. White said the robber was tall and thin and told them to "put the money in the bag." Cell phone records showed a phone connected to defendant sent signals to cell towers in the immediate area at the time of the robbery.

**October 12, 2013, O'Reilly Auto Parts Robbery**

On October 12, 2013, Chris Laporta and Jesse Hall were working at O'Reilly Auto Parts on Elkhorn Boulevard. That evening, they noticed an African-American man, later identified as defendant, enter the front door. [Footnote omitted.] Defendant was not wearing gloves and he opened the door with his elbows, not his hands. He walked through the store as though making sure there was no one else there. Defendant approached Laporta and Hall at the counter and said he was robbing them. He held a semiautomatic pistol pressed against his leg pointing at the floor. Laporta and Hall put their hands up.

Defendant told Hall to open the register and give him the money. He gestured with the gun, but did not point it at Hall. Hall put the money in a bag. Defendant was very calm.

Defendant ordered Laporta and Hall to take him to the safe. Laporta opened the safe and took out the money. When Laporta failed to open the safe's second compartment, defendant became upset and demanded that it be opened. Laporta said there was no money in the second compartment and defendant began waving the gun around and yelling. After Laporta found the key, he opened the safe and gave defendant its contents. Defendant told Laporta and Hall to stay in the office and not to call the police.

/////

Laporta called 911 and described the robber as a black male in his twenties, six feet to six feet five inches tall, and slender. He wore a dark jacket with a chevron patch. When officers responded, Laporta told them he might have seen the man outside the store prior to the robbery. A total of about $2,000 was taken from the store.

Cell phone records revealed that a phone associated with defendant sent a signal to cell phone towers near the site of the robbery.

**January 9, 2014, O'Reilly Auto Parts Murder and Attempted Robbery**

On January 9, 2014, Marc Zhuchenko, Ray Riffel, and Anthony Anderson were working at O'Reilly Auto Parts on Elkhorn Boulevard. That evening, Anderson saw an African-American man, later identified as defendant, enter the store. [Footnote omitted.] Defendant lifted up his shirt and pulled out a gun. He told everyone to go to the back room.

Anderson began to walk to the back of the store. Defendant again told everyone to go and nudged Zhuchenko on his right side in the kidney area with his gun. Zhuchenko spun around and Anderson saw him raise his arm. A few seconds later a shot rang out and defendant and Zhuchenko fell to the floor. Anderson heard a metallic click sound as the pair fell. Defendant jumped up and ran out the door.

Riffel walked towards the front of the store during the struggle. He saw Zhuchenko and defendant struggling and heard a single gunshot. According to Riffel, "it almost seemed as if, uh, Marc [Zhuchenko] was trying to either protect us or he was startled from behind and he just basically reacted." After Riffel heard a pop and saw a flash he ducked behind a shelf. He did not see the robber fall, but did see the robber look down, turn around, and run away

Both Anderson and Riffel called 911. Anderson described the robber as a black male wearing black jeans, hoodie, and hat. He did not wear gloves and did not conceal his face. Anderson believed he could identify defendant, but was unable to identify anyone in a photo lineup. Riffel did not see the gun or the robber's face.

**Testimony of Danielle Garner and Letitia Powell**

During this time, defendant was involved romantically with Danielle Garner. They met during middle school and began dating in 2011. From July 2013 through January 2014 defendant lived with his mother in Vallejo, but frequently stayed at Garner's apartment in North Highlands. Garner saw him almost every day.

On the afternoon of January 9, 2014, Garner's friend Letitia Powell and Powell's two children went to Garner's apartment for Powell's birthday. Defendant was present as they drank wine and talked. Defendant told Garner he was going to get some marijuana and asked to borrow her cell phone. He also borrowed Powell's car.

/////

Defendant was gone for a long period of time and Powell became concerned because it was getting late. Powell texted defendant on Garner's phone and he replied he was on his way back. Thirty minutes later defendant had not appeared and did not respond to texts or calls.

When defendant arrived he was in a panic. Garner followed him into a bathroom and saw his face was "gushing out with blood." She saw a black gun on the counter. Powell knocked on the door asking for her keys. When Garner came out of the bathroom to return the keys, she was huffing and puffing and seemed frustrated.

Garner asked Powell if she could take defendant to the hospital. When Powell asked what was going on, Garner said she did not know. Defendant changed his clothes and shoes, which were bloody. He put clothes in a bag and into Powell's car. Powell got into the driver's seat, Garner in the front passenger seat, and defendant and Powell's children in the back. Garner believed defendant's injuries required immediate hospitalization; he complained of a headache and could not see. However, defendant did not want to go to the hospital; he wanted to go to his mother's house.

Powell testified defendant did not want to go to the hospital because he was going to be in trouble. Defendant asked Powell to take him to a hospital in Vallejo where his mother worked. Although Garner offered to pay for the additional gas, Powell decided it was too far because defendant was bleeding and she did not want him to lose consciousness. [Footnote omitted.] Instead, Powell decided to take defendant to the nearest hospital. As they drove, Garner called her cell provider and reported her cell phone lost since defendant returned without it.

**Police Investigation**

That same evening, Sacramento County Sherriff's Department Sergeant Lindy Culp, dispatched to the O'Reilly Auto Parts in response to a report of a shooting, found other deputies performing cardiopulmonary resuscitation (CPR) on Zhuchenko. Zhuchenko lay on the floor behind the counter. A cell phone and shell casings lay nearby and a folding knife was on the counter next to Zhuchenko. Crime scene investigators collected evidence including the cell phone, knife, shell casing, and blood samples.

As Zhuchenko was transported to the hospital, officers forwarded information about the suspect alerting hospitals to be on the lookout for a male with stabbing injuries. At the emergency room, Sergeant Culp observed a visible gunshot wound in Zhuchenko's left rib cage and another wound above his hip on his right side. He also saw a bullet in the fabric in Zhuchenko's work shirt. Zhuchenko was pronounced dead that evening.

**Autopsy**

Dr. Gregory Reiber performed Zhuchenko's autopsy and found he died from massive blood loss due to a gunshot wound. The bullet

5

entered his chest perforating the diaphragm, aorta, spleen, large intestine, and right kidney, and exited his lower back. Dr. Reiber testified the chances of surviving such a gunshot wound are very poor, regardless of how swiftly the victim receives emergency treatment.

The entry wound showed evidence of a shot fired at close range. Dr. Reiber estimated the gun was inches away from Zhuchenko when fired. Zhuchenko also had a cut on his finger consistent with a possible offensive-type wound of a person holding a knife.

**Arrival at the Hospital**

When Powell and her passengers arrived at the hospital, Garner told Powell to tell hospital staff she picked defendant up off of Mack Road. Garner asked Powell to throw the bag defendant left in the car away.

Powell told Deputy Bunn she had received a cell phone call from defendant asking to be picked up. Powell picked defendant up in the area of Mack Road and Center Parkway where he had gotten into a fight. Deputy Bunn also interviewed Garner, who confirmed defendant had called to be picked up. Defendant had gotten into a fight on Mack Road after he asked someone for a cigarette. Garner was unsure where they had picked up defendant and defendant did not tell them what happened, just that he needed to go to the hospital. At trial, Garner conceded that this was the story defendant had instructed her to tell the police.

**Defendant's Interview at Hospital**

Officer Trejo questioned defendant at the hospital. He asked defendant how he sustained the bloody injury to his face. Reluctantly, defendant told Officer Trejo he left Powell's house to meet a friend. After the meeting, defendant ran into a man smoking a cigarette. Defendant asked him for a cigarette and the two got into an argument. The man grabbed defendant in a headlock and defendant felt blood dripping from his face. Defendant ran back to Powell's house.

Defendant was not sure where the attack took place. The man who stabbed him was a black male in his midtwenties, 5 feet 11 inches tall, 145 to 150 pounds, wearing a black hoodie and a red baseball cap. Officer Trejo forwarded the report to Deputy Bunn.

**Crime Scene Investigation**

Crime scene investigator Deputy Pasquale Cignarella examined defendant at the hospital. The right side of defendant's face was swollen and bruised. A laceration on his nose required stitches. Deputy Cignarella took gunshot residue samples from four areas on defendant's hands.

After defendant was transferred to another hospital, Deputy Cignarella collected a buccal swab. Deputy Cignarella booked the

gunshot residue kit and buccal swab into evidence and submitted them for processing.

Criminalist Jason Hooks examined the gunshot residue kit and concluded the results were consistent with defendant firing a gun, being in the vicinity of a fired weapon, or having handled a fired weapon or ammunition. Hooks testified that gunshot residue is easily lost; the majority of particles will be lost within four to six hours of the shooting.

**Garner Interview**

Detectives later questioned Garner at the sheriff's station. Initially, Garner related the same story about defendant getting into a fight about a cigarette. However, after detectives confronted her about the cell phone evidence, Garner offered a different story. According to Garner, she and defendant talked in the bathroom at [Garner's] house about him firing a gun. She saw a semiautomatic handgun on the counter. Defendant told Garner he was arguing and tussling with it when it went off. Defendant wanted her to take the gun, but she refused. She told detectives they would find the gun in the kitchen where defendant left it.

**Powell Interview**

Another pair of detectives interviewed Powell at her apartment. Initially Powell repeated the story about a fight, but then admitted what happened when confronted by Garner's statements. Powell said defendant told her "I'll do all the talking." She overheard defendant and Garner and thought defendant had a gun based on him saying "they might come here." Powell saw defendant put something in a towel in the kitchen.

Detectives, with Powell's permission, looked at the text messages and phone calls on her cell phone. The test messages included several between Garner's phone and Powell's phone. There were several exchanges and then a series of calls from Powell's phone to Garner's phone that were not returned.

**Search of Powell's Car and [Garner's] Apartment**

With Powell's permission, detectives searched her car and she directed them to the dumpster where she had thrown the bag of clothes. O'Reilly Auto Parts clerk Anderson identified the hoodie from the bag as matching the clothes worn by the robber. O'Reilly Auto Parts manager Riffel stated the hoodie was the same type of jacket as that worn by the robber.

At [Garner's] apartment, detectives found a Ruger model P89 nine-millimeter handgun inside the stove. The gun had no rounds in the chamber, but had seven live rounds in the magazine. Detectives discovered a pair of jeans and sneakers with apparent blood stains on the bedroom floor. They also found apparent blood stains on the bathroom sink and counter.

### Forensics—DNA

Forensic identification specialist Rhonda Johnson tested the Ruger for fingerprints, but found no usable prints. She also swabbed the gun for contact DNA and the swabs were booked into evidence. Criminalist Bruce Moran performed a forensic examination on the Ruger and concluded it was the weapon that fired the bullet found in Zhuchenko's shirt and the shell casing found on the floor. O'Reilly Auto Parts clerk Anderson identified the Ruger as resembling the weapon he saw the robber pull out of his waistband.

Criminalist Nikki Sewell analyzed the samples taken from the front door at the murder scene, the sidewalk, and the cell phone found by Zhuchenko's body. She determined the samples from the sidewalk and front door were blood. However, the substance on the cell phone could not be confirmed to be blood. The genetic profile of the DNA on the swabs was the same as the reference profile from defendant. The swab from the Ruger revealed the DNA profile of the major contributor was the same as the reference profile from defendant. DNA from a minor contributor was also located on the weapon.

### Cell Phone Records

Records for seven cell numbers connected to defendant and registered under his mother's name were admitted at trial. The cell phone records revealed that one pinged off cell towers in the area of the Watt Avenue, Fair Oaks Boulevard, and Elkhorn Boulevard at the time each crime occurred.

### Identifications

Garner, at trial, viewed surveillance video from the first robbery at the Auto Zone. She identified defendant from the video. Garner also identified the phone found at O'Reilly Auto Parts as the one defendant borrowed the day of the last robbery.

After defendant's arrest, Detective Paul Biondi created a lineup of six photos, including one of defendant. Detective Biondi showed Uhl, the parts manager from the initial Auto Zone robbery, the lineup and Uhl identified defendant as the robber. However, Uhl said he was not 100 percent sure. At trial, Uhl testified he was pretty certain in his identification. Detective Biondi also showed Uhl a photo of the Ruger and Uhl said, "Holy crap, yep, it looks like the same gun."

Detective Biondi showed White, a clerk from the second robbery, the lineup. White had seen a news report on another auto parts store robbery and the photo of the suspect looked like the same man who robbed his store. Although White identified defendant, he was not sure. White identified the photo of the Ruger as looking similar to the gun used in the robbery.

Detective Bondi also showed Laporta, a clerk from the third robbery, the lineup. Laporta identified defendant's photo and said he thought it was the robber. However, when shown a photo of the gun found in Garner's stove, Laporta did not think it looked like the same gun. At

trial Laporta identified the Ruger as looking like the gun used in the robbery, but he could not be sure.

Hall, another clerk from the third robbery, was unable to identify anyone when Detective Bondi showed him the lineup. Nor did Hall recognize defendant at trial. Hall said the photo of the gun was similar to the gun used in the robbery.

Detective Bondi also showed Montez, the manager from the second robbery, the lineup. Montez identified defendant. He also identified defendant at trial and the Ruger used in the robbery.

**Defense**

Defendant testified in his own defense. Although he admitted shooting Zhuchenko, defendant testified the shooting was accidental. He did not enter the O'Reilly Auto Parts to rob the store, but to warn employees about an armed man outside.

The night of the shooting, defendant was staying with Garner in North Highlands. He borrowed Powell's car to pick up marijuana at a friend's house. Since his phone wasn't working, he took Garner's phone. His friend lived across from the O'Reilly Auto Parts on Elkhorn Boulevard.

Defendant parked across the street from his friend's apartment. While walking down the street, defendant saw an African-American man smoking a cigarette. He asked if the man could spare a smoke. The man was rude and obnoxious and pointed him toward the store. The two got into a verbal exchange and defendant walked away.

Defendant went to his friend's apartment, but he was not home. As he walked back to Powell's car, he heard someone yell "check it out." The man he had seen earlier was standing near the O'Reilly Auto Parts. The man came toward him and said, "who you calling a bitch?" Defendant responded, "You heard what I said." Defendant was not afraid because he had his gun in his waistband.

The man pulled out a gun from his hoodie, but did not point it at defendant. He said, "Well show me then." Defendant did not pull out his gun because "that would have been suicide." He put up his hands, backed up, and went into the auto parts store. As he entered he pulled out his gun because he "didn't know what he was gonna do."

Once inside, defendant looked but did not see the man outside. When an employee asked if he needed help, defendant told him to "get back." He did not intend to rob the store, but only to warn about the man outside with a gun.

Defendant walked up to the counter to tell Zhuchenko to get out of the way. Zhuchenko was on the telephone with his back to defendant. Defendant approached Zhuchenko from behind and asked if he could get out of the way and that a man had pulled a gun on him outside. Zhuchenko looked at defendant, "turned his nose

9

> up" at defendant, and turned back around. Defendant walked between the counters using them as a shield. He looked out the window, but saw no one.
>
> Zhuchenko hung up the phone and then without warning stabbed defendant in the face. Defendant did not see the knife but felt it. He did not know he had been stabbed until he got back to Garner's apartment.
>
> Defendant put his hand to his face as Zhuchenko tried to get the gun. They struggled for a few seconds before the gun went off. Defendant did not intentionally pull the trigger. They continued to struggle after the gun went off and then both fell to the ground. Defendant got up and realized he was bleeding; he thought he had been shot in the face. He had not seen any blood during the struggle.
>
> Defendant ran out of the store and in the direction where the man outside had been standing. He was not thinking about the man being armed. He did not think to call 911, but drove back to Garner's apartment.
>
> At the apartment, defendant rinsed the blood off his face and saw his cheek was cut. Garner told him he needed to go to the hospital. Defendant then realized he had lost Garner's cell phone. He did not answer Powell's calls and texts because he had not heard them. Defendant put the gun in Garner's stove for safekeeping. After he changed clothes he did not put them in a bag or tell Powell to throw them away.
>
> According to defendant, it was he who decided to go to the nearest hospital. He lied to investigating officers at the hospital and made up a story of a fight over cigarettes. He denied knowing Garner or being at her apartment because he did not want to get into trouble for violating a restraining order. He did not coach Garner or Powell on what to tell the police. Defendant lied to the police because he did not want to get in trouble for possessing a firearm. He had no idea Zhuchenko had been shot or injured.
>
> The knife punctured defendant's eye. He has had vision problems since the incident and now wears glasses.
>
> Defendant had prior convictions for second degree burglary in 2007 and another felony in 2012. However, he denied committing the three other parts store robberies. His cell phone pinged off towers near the crimes because he must have been passing through the area.
>
> Because of his felony conviction, defendant was not allowed to possess a firearm. However, he had the Ruger for a year and a half prior to the shooting. Defendant had the gun to protect himself because he had problems with gang members. He also needed to protect himself when purchasing drugs.

ECF No. 21-9 at 2-15.

/////

With the exception of ordering minor modifications to the abstract of judgment which did not result in a change to petitioner's sentence of life without the possibility of parole, the California Court of Appeal denied petitioner's claims. Id. at 31. Petitioner sought review of the Court of Appeal's decision in the California Supreme Court, ECF No. 21-10. The petition was denied without comment. ECF No. 21-11.

II. <u>General Standards For Relief Under 28 U.S.C. § 2254</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively

>
> unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011).

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Petitioner's Claims and Analysis

    A. Instructions as to Lesser Included Offenses

Petitioner asserts the trial court should have, *sua sponte*, provided jurors with instructions as to offenses he argues are lesser included offenses of first degree felony murder. However, Supreme Court precedent does not require a trial court to instruct the jury on a lesser included offense in a non-capital case, Beck v. Alabama, 447 U.S. 625, 638 (1980), and the Ninth Circuit has held that claims such as petitioner's are not cognizable on federal habeas review. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000). Accordingly, petitioner is not entitled to habeas relief as to his first claim.[2]

---

[2] Petitioner asserts that if any part of his instructions as to lesser included offenses claim is deemed forfeited because of an omission made by trial counsel, then the omission amounts to ineffective assistance of counsel in violation of the Sixth Amendment. ECF No. 21-10 at 13. As indicated above, no part of petitioner's claim is deemed forfeited because of an omission made by trial counsel. Likewise, the California Court of Appeal, the only court to issue a reasoned opinion with respect to petitioner's lesser included offenses claim, did not deem any part of petitioner's

B. <u>Mistrial</u>

During trial, the prosecution elicited from petitioner that he was subject to a protective order concerning the three-year-old daughter of Danielle Garner. Petitioner claims that the trial court's failure to declare a mistrial after this evidence was presented violated petitioner's right to a fair trial under the Fourteenth Amendment. The California Court of Appeal, the only California court to issue reasoned decision with respect to this claim, addressed the claim as follows:

> **Background**
>
> The prosecution, before trial, moved to impeach defendant with prior convictions including a 2012 conviction for felony child abuse. Defense counsel asked the conviction be excluded as unduly prejudicial under Evidence Code section 352. The court admitted the child abuse conviction as a crime of moral turpitude relevant to defendant's credibility, but offered to entertain a defense request to sanitize the conviction. Defense counsel requested a meeting with the prosecution to reach an agreement about describing the offense as a "felony conviction involving moral turpitude." The court asked to be informed if any issue arose in that regard.
>
> Defendant testified in his own defense. He admitted being convicted of a 2007 felony verdict and "in 2012 of another felony involving moral turpitude." During cross-examination, the prosecution asked defendant about his post-arrest interview with detectives. Defendant admitted he lied about how he was stabbed. The prosecution asked defendant why he had not mentioned Garner during the interview although he stated he was in Powell's apartment. Defendant testified he was trying to conceal his relationship with Garner because "me and Danielle had an incident in 2012 and it was supposed to be a keep away." When the prosecution asked if this was the reason defendant distanced himself from Garner, defendant said it was.
>
> The prosecution questioned defendant about owning the Ruger nine-millimeter handgun.
>
>> [Prosecution]: "Now, at the time, over a year before this incident of January 2014, Danielle's kid was living with her?
>>
>> "[Defendant]: Are you asking me a question or --
>>
>> "[Prosecution]: You know that; don't you?
>>
>> "[Defendant]: So could you repeat that again?

---

claim forfeited because of the actions of trial counsel or otherwise.

13

> "[Prosecution]: At the time you bought this gun, when you asked Danielle to help you pay for the gun, her child, her daughter . . . was living with her at home?
>
> "[Defendant]: Yes, she was living with her at her home, Elk Grove."

On redirect, defense counsel asked about defendant's relationship with Garner.

> [Defense Counsel]: "You also were asked questions by [the prosecution] . . . about your relationship with Danielle and how you had not been completely honest with the officer in describing that. Do you remember this line of questioning this morning?
>
> "[Defendant]: Yes, I do.
>
> "[Defense Counsel]: Did you -- were you and Danielle involved in some prior incident in which there was a no contact order issued by some court?
>
> "[Defendant]: Yes, there was.
>
> "[Defense Counsel]: And in spite of that no contact order, did you and Danielle still continue to see each other?
>
> "[Defendant]: Yes, we did.
>
> "[Defense Counsel]: Were you concerned that if you admitted just being around Danielle that you would also find yourself in trouble and possibly going to jail based on that?
>
> "[Defendant]: Yes. I believe I was gonna possibly be in trouble for being around Danielle.
>
> "[Defense Counsel]: Okay. Is that why you were kind of sidestepping the questions about your relationship with her and how long you had known her, et cetera?
>
> "[Defendant]: Yes. That and being at her apartment."

Prior to recross-examination, there was an unreported bench conference, which the trial court later discussed. The prosecution questioned defendant about his prior testimony about hiding his gun in Garner's stove because it was a safe place.

> [Prosecution]: "As a matter of fact, the stay away order that was between you and Danielle wasn't . . . protecting Danielle. It was protecting her three-year-old daughter from you. Right?

/////

/////

14

1     "[Defendant]: It was protecting me from all of them.

2     "[Prosecution]: The condition of your probation was that you could have no contact whatsoever with [Garner's daughter] right?

4     "[Defendant]: I was under the impression of it was to protect none of -- [Garner's daughter], Danielle, the father, none of the family.

6     "[Prosecution]: When you accepted the conditions of probation in court in January of 2013, you were explained that one of the conditions was that you could have no contact with [Garner's daughter], and it was provided to you in writing. Do you remember that?

9     "[Defendant]: I remember it was explained to me in court, and like I said . . . what I got from it was that I have no contact of [sic] the victim and family.

11     "[Prosecution]: Do you want to see a copy of it?

12     "[Defendant]: I don't mind seeing a copy of it.

13     "[Prosecution]: Do you want to see it?

14     "[Defendant]: I don't mind seeing a copy of it if you want to show me.

16     "[Prosecution]: Okay.

    "[Defense Counsel]: Can I have a discovery page?

18     "[Prosecution]: At this time -- I'm going to rephrase that question. . . Was it your understanding that [Garner's daughter] wasn't living with Danielle at the time of this offense January 9th --

20     "[Defendant]: Yes.

21     "[Prosecution] : -- 2014? And was it your understanding that you were not to have any contact with [Garner's daughter] or members of her family without prior permission from the Probation Department?

23     "[Defendant]: Yes.

24     "[Prosecution]: Okay. And that included Danielle?

25     "[Defendant]: It included her family members.

26     "[Prosecution]: And --

27     "[Defendant]: Danielle is their mother, so it's her family member, right?

"[Prosecution]: Okay. But Danielle at this time did not have custody of [her daughter], right?

"[Defense Counsel]: Well, I'm going to object. That's irrelevant.

"[The Court]: Overruled.

"[Defendant]: No. Of January 9th, if you're asking, no.

"[Prosecution]: Somebody else had custody of her?

"[Defendant]: Yes.

"[Prosecution]: And you saw and actually lived with Danielle on a regular basis at that time?

"[Defendant]: From that point on -- are you talking about January 9th or --

"[Prosecution]: January 9th.

"[Defendant]: Yes.

"[Prosecution]: Okay. So there was nothing that prevented you from telling the officers that you were living with Danielle at her apartment?

"[Defense Counsel]: I'm going to object as argumentative.

"[The Court]: Overruled.

"[Defendant]: Yes, it was.

"[Prosecution]: Those are all the questions I have."

After the jury was excused, defense counsel moved for a mistrial based on the questioning about the no-contact order with Garner's daughter. Defense counsel stated that at the sidebar conference the prosecution said he believed that defense counsel opened the door regarding defendant's belief he was to have no contact with Garner. The prosecution represented to the court that the probation order required defendant to stay away from the daughter and not from Garner. Defense counsel argued the prosecution's questioning violated the *in limine* ruling and could leave the jury with the impression that defendant was on probation for some incident "that disallows contact with a three-year old girl." The prosecution stated an intent to prove Garner no longer had custody of her daughter and therefore was not included in the no-contact order and "there was no reason for him to hide behind what the defense really portrayed as something like a domestic violence incident between him and Danielle."

The court described the earlier side bar conference, discussed the objected to questions, and denied defendant's motion for a mistrial.

16

Defendant, the court noted, testified he did not want to tell investigating officers about Garner's apartment or that he was staying there because he was not supposed to have contact with her. According to the court, "That raised the issue for the People. It was their understanding that the protective order was protecting not Danielle, but the child." Therefore, the court permitted the prosecution to question defendant regarding the protective order.

During the questioning, the prosecution got a copy of the order and realized it included the child and the child's family members. The court concluded: "I don't think there was any intentional misrepresentation. [¶] I think that after reviewing the protective order, in order to show it to the defendant, [the prosecution] then asked the question more clearly as far as being precluded from being around the child and her family." As for the questions regarding whether Garner had custody of the child and if defendant had any reason to stay away from Garner and her apartment, the court found the questioning proper. The court found no prejudice: "[T]here was nothing as far as the details of the crime or the age of the child or anything else that would cause any particular prejudice under these circumstances." The court denied the motion for a mistrial.

**Discussion**

Defendant argues the trial court abused its discretion in not granting his mistrial motion. According to defendant, an admonition would not have cured the prejudice to defendant.

A trial court should grant a motion for mistrial only when the opportunity for a fair trial has been irreparably lost and prejudice cannot be cured by admonition or instruction. We review a denial of a motion for mistrial for an abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

Here, defendant agrees that the prosecution did not intentionally misrepresent that the no-contact order covered only Garner's daughter when he sought permission to cross-examine defendant about the order. However, defendant argues the trial court should have granted the motion because inadmissible evidence was admitted which incurably prejudiced his defense.

According to defendant, "Although the jury was not specifically told the basis of appellant's 2012 conviction, the jury knew it was a felony of moral turpitude, because appellant had already testified he had such a 2012 conviction. The jury would have realized appellant was on probation from this offense, which had been denominated a crime of moral turpitude, as appellant's last conviction was in 2012, and he was arrested in the instant case in January 2014. The jury would have thought, at a minimum, that appellant had engaged in a crime of moral turpitude that affected Garner's three-year old daughter. The jury was not told the meaning of 'moral turpitude,' but in the context of a young girl, to many jurors this would connote improper sexual behavior or other physical abuse. This evidence was highly prejudicial to the jury's view of appellant's character and his readiness to do evil."

17

> We disagree. The testimony did not reveal what crime defendant had been convicted of, only that it involved moral turpitude. There was no discussion of the offense or any mention of any type of abuse. The prosecution's aim was to refute defendant's claim that he lied to police about being at Garner's apartment because of the no-contact order. Whether or not defendant had a reason to lie about being at the apartment where the gun was found was certainly relevant, and the relevance outweighed any possible prejudice from the limited exploration of the no-contact order during testimony. The court did not err in denying defendant's motion for a mistrial.

ECF 21-9 at 20-27.

Federal habeas relief is generally not available to review questions about the admissibility of evidence. Estelle v. McGuire, 502 U.S. 62, 67 (1991). Federal courts may not interfere with a state evidentiary ruling, but may only consider whether evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. See id. at 67-68. Furthermore, in order to grant habeas relief on a claim such as this, petitioner must show that the admission of evidence "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

The court cannot find that the evidence indicating petitioner was ordered in 2013 not to have any contact with Danielle Garner's daughter violated fundamental due process, the right to a fair trial, or that the evidence "had a substantial and injurious effect of influence in determining the jury's verdict. The jury was not informed as to why the order was entered except that it was the result of an incident involving petitioner and Danielle Garner in 2012. From other evidence the jury could have inferred, at most, that this incident was a crime of "moral turpitude."

The jury could have speculated as to the more-specific nature of the offense. But it cannot be said that any reasonable conclusion reached by the jury could have resulted in any meaningful prejudice to petitioner in the form of evidence of similar prior bad acts as the crimes charged in the action were not domestic in nature, sexual in nature, and did not otherwise involve children. Any suggestion that jurors would have held the protective order against petitioner to any meaningful degree is not supported by the record. Jurors had ample reason to find petitioner not credible based upon his own prior inconsistent statements and because his testimony was contradicted by other evidence. Other than petitioner's credibility, the matters at issue included

18

the victims' identification of petitioner and the circumstances surrounding the shooting of Marc Zhuchenko which are issues fact-specific to this case. These matters are simply not related in any meaningful way to the existence of the protective order at issue.

For these reasons, petitioner's second claim should be denied. Furthermore, the California Court of Appeal's rejection of the claim is not contrary to clearly established federal law, it is not based upon an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States and it is not based upon an unreasonable determination of the facts. Accordingly, relief is precluded under 28 U.S.C. § 2254(d) as well.

### C. Continuous Possession of Firearm

As indicated above, petitioner pled guilty to four counts of possession of a firearm by a convicted felon. Each count was based upon petitioner's possession on a different day. Petitioner asserts that, pursuant to California Penal Code § 654, he could only be sentenced on one count of possession of a firearm by a convicted felon because petitioner's possession of the firearm in question was continuous during and between all of the events underlying each conviction.

As explained above, a writ of habeas corpus can only be granted for a violation of federal law. Whether the trial court violated California Penal Code § 654 in sentencing petitioner on all four counts of possession of a firearm by a convicted felon is a matter of state law which this court cannot reach. Accordingly, petitioner is not entitled to habeas corpus relief as to his third claim.

## IV. Conclusion

For all the foregoing reasons, the court will recommend that petitioner's amended application for a writ of habeas corpus be denied and this case be closed.

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's amended petition for a writ of habeas corpus (ECF No. 6) be denied; and
2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  June 8, 2022

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
adds0847.157